**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| VERTEX PHARMACEUTICALS INCORPORATED, | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 16-11912 |
| FRANK GARY RENSHAW, | ) | |
| Defendant. | ) | |

## OPPOSITION TO MOTION TO DISMISS COUNTERCLAIMS

Now comes Counter Claimant, Dr. Frank Gary Renshaw ("Dr. Renshaw") and states the following in opposition to the Motion to Dismiss filed by Counter Defendants Vertex Pharmaceuticals Incorporated ("Vertex"), Scott Fields ("Fields") and Marina Penney ("Penney") (collectively, "Counter Defendants").

## INTRODUCTION

On October 26, 2016, Dr. Renshaw filed his Counterclaim against the Counter Defendants alleging bad faith termination of employment against Counter Defendant Vertex and intentional interference with contractual relations against Counter Defendants Fields and Penney. See Docket No. 12. Because of Counter Defendants' improper conduct, Dr. Renshaw suffered damages, and he now seeks relief from this Court as a result.

On December 15, 2016, the Counter Defendants filed a Motion to Dismiss Counterclaims and a Memorandum of Law in Support. See Docket Nos. 20, 21. With respect to Count I against Vertex for bad-faith termination of employment, Vertex argues that Dr. Renshaw fails to allege facts that, if proven, would satisfy his burden to prove the elements of this claim. Specifically, Vertex argues that Dr. Renshaw does not identify any compensation that he was

owed for his past services, and absent such allegations, his claim for bad faith termination cannot survive. Vertex also argues that Count I should be dismissed because Dr. Renshaw fails to allege that he was terminated by Vertex or to allege facts that would support a claim that Vertex constructively discharged him.

With respect to Count II against Fields and Penney for intentional interference with contractual relations, the Counter Defendants argue that Dr. Renshaw failed to allege facts from which the Court could conclude that Fields or Penny acted with actual malice. Absent such allegations, Fields and Penny argue, Dr. Renshaw's interference claim must fail.

On January 5, 2016, Dr. Renshaw filed an Amended Counterclaim as a matter of right in order to correct an error contained within the date in paragraph 27 of the Counterclaim. There were no other changes from the original Counterclaim. Given the relatively minor change, the parties and the Court have agreed that the Motion to Dismiss filed by the Counter Defendants will apply to the Amended Counterclaim.

As the following will show, this Court should not dismiss any Count contained within the Counterclaim. Regarding Count I, Vertex misapplies the law in this context. In order to bring a claim for bad faith termination of employment, Dr. Renshaw need only allege facts that could lead to a finding of bad faith or unfair dealing. He has done this. As will be explained below, Vertex's timing argument misses the mark.

Regarding Count II, Doctor Renshaw has alleged more than enough facts that if proven will allow a finder of fact to infer that Fields and Penney acted with improper motive or means to a degree that would support Dr. Renshaw's interference claim. Dr. Renshaw need not plead any facts establishing actual malice at this juncture. Counter Defendants attempt to hold Dr. Renshaw to a pleading standard that is not required in this context.

Accordingly, this Court should deny the Counter Defendants' motion in its entirety.

**STATEMENT OF FACTS**

Dr. Renshaw is a highly skilled physician who performs a critical role in seeking effective treatments for cancer and other deadly diseases. Counterclaim, ¶ 9. On or about September 15, 2015, the parties entered into an employment agreement, under which Vertex agreed to provide Dr. Renshaw with a hiring bonus and other compensation, including without limitation, eligibility to participate in Vertex's annual performance incentive program. Counterclaim, ¶ 10 and Ex. A. Vertex offered Dr. Renshaw such compensation as an inducement for him to leave his prior employer before he received compensation that he would have otherwise earned. It was Dr. Renshaw's understanding that he would receive an equity award, or the opportunity to acquire Vertex equity, prior to the end of 2015. Counterclaim, ¶¶ 11-12.

Vertex hired Dr. Renshaw to lead a team of professionals in efforts to obtain regulatory approval of Vertex products designed to treat cancer patients. A key aspect of Dr. Renshaw's role was to oversee patient studies that would provide data necessary to measure the effectiveness of Vertex products. While employed at Vertex, Dr. Renshaw used his best efforts to perform his duties in a satisfactory manner. Because of the critical job he performs, Dr. Renshaw approaches his work with a very high expectation of excellence in his work environment. Dr. Renshaw's chosen field is a profession that demands an environment that will encourage the effectiveness of the professional and meet his or her needs so as to facilitate effective results. Counterclaim ¶¶ 13-17.

By constructively terminating Dr. Renshaw, Vertex stood to gain economically by attempting to claw back Dr. Renshaw's sign-on bonus and relocation benefits and withholding

the equity compensation it had promised him. Vertex accomplished such constructive termination by failing to provide resources and personnel needed for Dr. Renshaw to enroll a sufficient number of patients in the program Vertex hired him to lead. Vertex, Fields and Penney failed to provide an environment where Dr. Renshaw could obtain the data needed to accomplish what Vertex hired him to do. Counterclaim, ¶¶ 18-20. Vertex, through Fields, informed Dr. Renshaw that it was replacing him with two consultants. Vertex and Fields removed Dr. Renshaw from a key project. Vertex and Fields refused to accommodate Dr. Renshaw’s request for a revised schedule necessary for him to meet his family demands, despite there being no legitimate employment reason for them to do so. In fact, Vertex and Fields never even responded to Dr. Renshaw’s reasonable request for an accommodation. Counterclaim, ¶¶ 21-24. Vertex, Fields and Penney systematically removed Dr. Renshaw from involvement with important meetings, including, without limitation, meetings regarding molecular science and biology and program strategy and denied him the opportunity to participate in important phone calls. Vertex and Penney included study design comments without Dr. Renshaw’s consent that made it difficult to enroll patients in the program that Dr. Renshaw was hired to lead. Vertex required Dr. Renshaw to meet a certain result before the end of December, 2016, but removed his ability to have input in how to obtain that result. Counterclaim, ¶¶ 25-27.

As a result of this continuous pattern of misconduct, the work environment had deteriorated to such a degree that it became clear to Dr. Renshaw that it would be impossible for him to obtain his end of year objective, and Vertex would terminate him in December. Vertex effectively gave Dr. Renshaw's job to someone else, transferred his responsibilities, left him without authority, and ultimately relegated him to a nonexistent job. Counterclaim, ¶¶ 28-29. It is much more difficult for a person in Dr. Renshaw's line of work to find a job at the end of the

year. Because of his family commitments, Dr. Renshaw could not afford to be unemployed for a significant period of time. Had Dr. Renshaw permitted Vertex to terminate him, his future career prospects may have been harmed. Dr. Renshaw did as any reasonable person in his position would have done. He felt compelled to resign and ultimately did so. Counterclaim, ¶¶ 30-33.

All of the foregoing facts, if proven to be true, would lead this Court to conclude that Counter Defendant Vertex constructively terminated Dr. Renshaw's employment in bad faith and Counter Defendants Fields and Penney intentionally interfered with the employment contract Dr. Renshaw had with Vertex. The end result is that this misconduct resulted in damages to Dr. Renshaw entitling him to relief as stated in the Counterclaim. Accordingly, Dr. Renshaw respectfully requests this Court to deny the Counter Defendants' Motion to Dismiss.

## LEGAL STANDARD

To survive a motion to dismiss, a complaint must allege sufficient facts which, if true, would raise the right to relief above the speculative level, showing that the claim, upon which the complaint is predicated, is plausible on its face. Bell Atlantic v. Twombly, 550 U.S. 555, 570 (2007). To be plausible on its face, the complaint must must plead facts sufficient for the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Rule 12(b)(6) does not countenance dismissals based on a judge's disbelief of a complaint's factual allegations. Neitzke v. Williams, 490 U.S. 319, 327 (1989). Indeed, a well-pleaded complaint may proceed even if it appears that a recovery is very remote and unlikely. Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). Under Rule 12(b)(6), a district court may properly consider only facts and documents that are part of or incorporated into the complaint. Trans-Spec Truck Serv. v. Caterpillar, Inc., 524 F.3d 315, 321 (1st Cir. 2008).

## ARGUMENT

**A. The Counterclaim States a Claim That Vertex Breached the Implied Covenant of Good Faith and Fair Dealing When it Terminated Dr. Renshaw.**

In every contract, there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right to the other party to receive the fruits of the contract, which means that in every contract there exists an implied covenant of good faith and fair dealing. Fortune v. National Register Cash Register Co., 373 Mass. 96, 104 (1977). This rule extends to an at will employment contract. Id. In Fortune, the plaintiff was a party to an at will employment arrangement. The agreement entitled him to bonus commissions related to sales he had made. Before he had received the commissions contemplated under the contract, the defendant terminated him.

The court noted that when a principal seeks to deprive an agent of all compensation by terminating the contractual relationship when the agent is on the brink of successfully completing the sale, the principal has acted in bad faith, and the ensuing transaction is to be regarded as having been accomplished by the agent. Id. at 104-105. Courts have applied this rule to prevent overreaching by employers in the forfeiture by employees of benefits almost earned by the rendering of substantial services. Id. at 105 (citations omitted). In this type of case, the question of bad faith is properly placed before the jury. The question for the jury is on the defendant's motive in terminating the employment. 373 Mass. at 103. In Fortune, the court concluded that a jury could have found that the defendant changed plaintiff's title or fired him so that it could avoid paying commissions. Id. at 106.

Here, Dr. Renshaw alleges that Vertex terminated him to avoid paying him elements of compensation contemplated under his employment contract, namely, a hiring bonus and

relocation allowance, equity compensation and other future compensation. Like the plaintiff in Fortune, he is entitled to have a jury decide whether Vertex terminated him in order to avoid paying him that compensation. Stated another way, Dr. Renshaw could reasonably expect that his employment would not be terminated by Vertex in order to deny him his hiring and relocation bonuses, the contemplated equity compensation and other compensation called for under the contract. Cf. Maddaloni v. Western Mass. Bus Lines, 386 Mass. 877, 881 (1982) (stating that the plaintiff, like the plaintiff in Fortune, could reasonably expect that his employment would not be terminated by the defendant in order to deny him compensation contained in his at-will employment contract).

In its Motion, Vertex strenuously argues that Dr. Renshaw's counterclaim must be dismissed because claims under the Fortune doctrine can only relate to an employer's failure to pay compensation that is related to a terminated employee's past service. Memorandum, p. 7. In making this argument, however, Vertex fails to recognize the distinction between the loss of future wages for past service, and the loss of future income for future services. The former are recoverable under the Fortune doctrine while the latter are not. See Gram v. Liberty Mut. Ins. Co., 384 Mass. 659, 672 (1981). In Gram, the court remanded a case for a determination of damages where the evidence showed that the terminated plaintiff lost reasonably ascertainable future compensation based on past services. Id. at 671, 674. There was no dispute in Gram that the plaintiff would have been entitled to the compensation at issue in that case had he continued to work for the defendant. Id. at 673-74. The Gram court further stated that the plaintiff need not show an improper motive for his discharge, because fair dealing requires recognition of the agreed worth of the employee's past service. Id. at 672.

This is exactly the case we have here. There is no dispute that Dr. Renshaw would have been entitled to receive the hiring bonus and the relocation bonus had he continued to work for Vertex. He performed the services necessary to receive this compensation, namely, he gave up his former position and signed on with Vertex. Furthermore, as he alleges in the Counterclaim, Dr. Renshaw would have been entitled to equity compensation and other compensation set forth in his employment agreement. Counterclaim, ¶ 42. As Gram points out, fair dealing requires recognition of the agreed worth of Dr. Renshaw's foregoing substantial compensation with his former employer and joining Vertex. See Gram, 384 Mass. at 672.

Vertex fails to recognize that Dr. Renshaw had done everything needed to secure the compensation at issue prior to Vertex's terminating him and therefore improperly asks that his Counterclaim be dismissed. Dr. Renshaw is not asking for continuation of his base salary after his termination date or any other "future income for future services." He is merely asking for compensation for which he had already performed. This Court should recognize this distinction and deny Vertex's Motion.

**B. Dr. Renshaw has Alleged Facts Leading to the Conclusion that Vertex Constructively Discharged Him.**

Dr. Renshaw agrees that GTE Prods. Corp v. Stewart, 421 Mass. 22 (1995), and Rubin v. Household Commer. Fin. Servs., 51 Mass. App. Ct. 432 (2001), accurately state the relevant legal principles applicable to establishing a constructive discharge. Thus, GTE sets forth the general rule that a constructive discharge occurs when an employer's conduct effectively forces an employee to resign. Although the employee may say, "I quit," the employment relationship is actually severed involuntarily by the employer's acts, against the employee's will. GTE, 421 Mass. at 34. Citing Turner v. Anheuser Busch, 7 Cal. 4th 1238, 1247 (1994), the GTE court goes

on to say that in order to amount to a constructive discharge, adverse working conditions must be unusually aggravated or amount to a continuous pattern before the situation will be deemed intolerable. Id. at 34-35. Further explaining, the GTE court uses Aviles-Martinez v. Monroig, 963 F.2d 2 (1st Cir. 1992) as an example of this principle. In that case, the employer removed all of the employee's files, then continually chastised him for not doing his work.

Here, Vertex removed or failed to supply the resources Dr. Renshaw needed to perform his work and then forced him to endure the humiliation associated with removal of his responsibilities, shut him out of meetings, replaced him with two consultants and refused to listen to his requests for a work schedule that would allow him to meet his family demands. Like the plaintiff in Aviles-Martinez, Dr. Renshaw was faced with the choice of being terminated or returning to an unfavorable work environment until he was. Id. at 6. Thus, Vertex engaged in a "continuous pattern" of conduct that ultimately caused Dr. Renshaw's termination of employment. Accordingly, Dr. Renshaw has definitely alleged facts that should lead this Court to conclude that Vertex constructively discharged him.

In addition to the foregoing, the "demotion" line of constructive discharge cases explained in Rubin is also helpful to Dr. Renshaw's position. Dr. Renshaw had an express employment contract that was so materially breached by Vertex as to make Dr. Renshaw's continued performance virtually pointless. See Rubin, 51 Mass. App. Ct. at 446. Counter Defendant argues that Dr. Renshaw does not satisfy this standard, but according to the Rubin court, he does. Courts have found constructive discharge if the employer effectively gave the employee's job to someone else, transferred the employee's responsibilities leaving him without authority, or reassigned the employee to a nonexistent job. Rubin, 51 Mass. App. Ct. at 446 (citations omitted). This type of conduct is precisely what we have here. Vertex intended to

give Dr. Renshaw's job to two consultants, transferred Dr. Renshaw's responsibilities to others leaving him without authority to perform the job he was hired to do, and ultimately relegated him to a role that was the equivalent to a nonexistent position.

Vertex argues that Dr. Renshaw did not allege that any express term of his employment agreement was materially breached by Vertex. At the outset, it is important to note that he is not required to do so because a written employment agreement is not necessarily required to establish a constructive discharge. See Rubin, 51 Mass. App. Ct. at 442-445. Regardless, Dr. Renshaw attached his employment agreement to the Counterclaim as an Exhibit. The Agreement states that his position is Senior Medical Director. Vertex materially breached this Agreement when it intended to give Dr. Renshaw's Senior Medical Director job to two consultants and others, leaving him without authority to perform the job he was hired to do, and ultimately relegated him to a role that was the equivalent to a nonexistent position. See Counterclaim, ¶ 29.

Parrett v. City of Connersville, 737 F.2d 690 (7th Cir. 1984), further demonstrates what it means to be constructively discharged. In that case, the employee argued he was constructively discharged because his working conditions were made so miserable that he was forced to quit. The employee had been demoted from chief of detectives to a position where he was given a windowless, former storage closet as an office. Id. at 693. The room had a desk and chair but no other furniture and no telephone. The employee spent his work hours sitting at the desk with nothing to do. Id. The court noted that for some, these type of working conditions might seem like paradise, but as a former chief of detectives, still young, the employee was not a “drudge or a time-server” but an ambitious professional. Id. at 694. Enforced idleness was not only a humiliating counterpoint to his years as detective chief but would if prolonged have depreciated

his professional skills to the point where it would have been difficult for him to work his way back to a responsible position. For anyone with some self-respect, the position that defendants placed the employee in was intolerable. Even if his health had not collapsed under the strain, the court noted, he would have had to quit. The defendants were therefore responsible for his leaving. Id.

Similarly, Vertex hired Dr. Renshaw as a Sr. Medical Director with the Clinical Medical Directors Team in Boston, a position of great authority and prestige. Unfortunately, however, over time, Vertex placed him in a position like the former chief of detectives in Parrett. Vertex failed to provide the resources and personnel needed for Dr. Renshaw to be successful and failed to provide an environment where he could obtain the data he needed to accomplish what he was hired to do. Vertex informed him he was to be replaced by consultants. Vertex removed him from a key project and involvement with important meetings, and denied him the opportunity to participate in phone calls that were required for him to adequately perform his position. In effect, he was given a windowless office with no telephone. Stripped of his authority, Dr. Renshaw, an ambitious professional, was humiliated. Furthermore, had he allowed Vertex to terminate him it would have harmed his future career prospects to the point where it may have been difficult for him to work his way back to a position suitable to his background and experience. For anyone with some self-respect, such as Dr. Renshaw, the position that Vertex left him in was intolerable. He left employment because of Vertex's conduct and was therefore constructively discharged. Accordingly, contrary to Counter Defendant's assertions, Dr. Renshaw's Counterclaim adequately sets forth facts establishing that he was constructively discharged, and this Court should therefore deny Vertex's Motion to Dismiss Dr. Renshaw's claim that Vertex terminated him in bad faith.

**C. Dr. Renshaw's Counterclaim States a Claim that Counter Defendants Fields and Penney Interfered with Dr. Renshaw's Employment Agreement with Vertex.**

In order to prevail on his intentional interference with contractual relations claim, Dr. Renshaw will be required to show that (i) he had a contract with a third party, (ii) Fields and Penney knowingly interfered with that contract, (iii) Fields' and Penney's interference, in addition to being intentional, was improper in motive or means, and (iv) Dr. Renshaw was harmed by Fields' and Penney's actions. E.g., Harrison v. NetCentric Corp., 433 Mass. 465, 476 (2001). The Counter Defendants argue that Dr. Fields has not alleged sufficient facts under the second and third elements.

Counter Defendants Fields and Penney focus on the third element rather than the second. Regarding the second element, Fields and Penney merely state that it could not have been met because the contract was not breached. See Motion, p.15. As set forth in Harrison, the second element consists of knowing interference with a contract. The contract at issue is Dr. Renshaw's employment as a Senior Medical Director with Vertex. Fields and Penney interfered with that contract when they failed to provide an environment where Dr. Renshaw could obtain the data needed to accomplish what Vertex hired him to do. Fields informed Dr. Renshaw that Vertex was replacing him with two consultants. Fields removed Dr. Renshaw from a key project. Fields refused to accommodate Dr. Renshaw's request for a revised schedule necessary for him to meet his family demands, despite there being no legitimate employment reason for him to do so. In fact, Fields never even responded to Dr. Renshaw's reasonable request for an accommodation. Fields and Penney systematically removed Dr. Renshaw from involvement with important meetings, including, without limitation, meetings regarding molecular science and biology and program strategy and denied him the opportunity to participate in important

phone calls. Penney included study design comments without Dr. Renshaw's consent that made it difficult to enroll patients in the program that Dr. Renshaw was hired to lead. It cannot be argued that Fields and Penney did these things without knowing they would have an impact on Dr. Renshaw's employment relationship with Vertex. Accordingly this Court should recognize that Dr. Renshaw adequately alleged facts sufficient to meet the second element of his interference claim.

There can be no doubt that Dr. Renshaw has also alleged facts sufficient to meet the third element of what constitutes intentional interference. At the outset, it is important to note that "actual malice" only needs to be shown if the defendants were acting within the scope of their employment responsibilities. See Gram v. Liberty Mutual Ins. Co., 384 Mass. 659, 663 (1981); Steranko v. Inforex, Inc., 5 Mass. App. Ct. 253, 272-73 (1977). Thus, if such interference is found to be intentional and without justification, it is malicious in law even though it arose from good motives and without express malice. Steranko, 5 Mass. App. Ct. at 273 (citing Grammenos v. Zolotas, 356 Mass. 594, 597 (1970)). Here, Fields and Penney acknowledge that they will raise as a defense the existence of the privilege that will entitle them to require Dr. Renshaw to prove actual malice. Motion, p. 13, n.5. Thus, it is premature to require Dr. Renshaw to plead it at this time.

Furthermore, even if Dr. Renshaw had to allege actual malice at this juncture, "[m]alice may be shown by the proof of facts from which a reasonable inference of malice may be drawn." Gram, 384 Mass. at 664. The fact there is no direct evidence that individuals acted with malice to obtain an employee's discharge "is not dispositive." Id. The trier of fact may infer malice from a rational inference of probabilities from established facts. Id. Here, Field's and Penney's repeated acts against Dr. Renshaw's employment interests could cause a trier of fact to infer that

Fields and Penney had a malevolent intent to destroy Dr. Renshaw's career at Vertex and perhaps at other potential places of employment as well.

Dr. Renshaw alleges that Counter Defendants Fields and Penney intentionally committed many acts that interfered with his employment relationship with Vertex. This is all he needs to do at this stage of the proceedings. Accordingly, this Court should deny Fields' and Penney's Motion to Dismiss Dr. Renshaw's interference claim.

## CONCLUSION

For the foregoing reasons, Dr. Renshaw respectfully requests that this Court deny Counter Defendants' Motion to Dismiss in its entirety.

Dated this 11th day of January, 2017.

Respectfully Submitted,
Dr. Frank Gary Renshaw
By his Attorneys,

/s/ Michael F. Tomasek
Michael F. Tomasek (admitted pro hac vice)
Tomasek Law Office, LLC
195 N. Front Street, Suite A
Braidwood, IL 60408
815-390-5141

James F. Radke
Murtha Cullina LLP
99 High Street
Boston, MA 02110
617-457-4130

Attorneys for Counter Claimant

**CERTIFICATE OF SERVICE**

I, Michael F. Tomasek, certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on this 11th day of January, 2017, and paper copies will be sent to those indicated as non-registered participants.

/s/ Michael F. Tomasek
Michael F. Tomasek